## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 18 2015, 9:21 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Timothy J. Burns
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Kenneth E. Biggins
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Patrick Green, *Appellant-Defendant,* | March 18, 2015 |
| | Court of Appeals Case No. 49A04-1406-CR-273 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable David Cook, Judge |
| | Cause No. 49F07-1306-CM-36556 |

**Kirsch, Judge.**

[1] Following a bench trial, Patrick Green was convicted of animal cruelty,[1] a Class A misdemeanor. He appeals raising two issues that we restate as:

> I. Whether the trial court erred in admitting evidence obtained by the animal control officer at the scene; and
>
> II. Whether the State presented sufficient evidence to convict Green.

[2] We affirm.

## Facts and Procedural History

[3] On March 12, 2013, Indianapolis Animal Care and Control ("ACC") Officer Michael Bonito was dispatched to Green's residence in Indianapolis to investigate possible animal neglect. Officer Bonito advised Green of the reason for his visit, and Green was cooperative and friendly, escorting Officer Bonito to the backyard of the residence to view two dogs. One dog, gray in color, appeared healthy. Officer Bonito observed another dog, a brown pit bull, housed separately in a chain-link enclosure area that contained a plastic igloo-shaped kennel. The brown dog was emaciated; its hips, spine, and ribs bones were clearly visible and protruding. The dog had an open, infected wound on each front leg; one wound was open down to the bone. The dog's ankle joints were swollen to twice their normal size. At least one front leg was broken, such that the foot was at an unnatural angle, and the dog could not walk. There was

---

[1] *See* Ind. Code § 35-46-3-7(a)(1)(2). We note that, effective July 1, 2014, a new version of this statute was enacted, but because Green committed the offense in 2013, we will apply the statute in effect at that time.

food and water about a foot and a half away from the dog.  Officer Bonito observed a large amount of urine and feces inside the dog's kennel.

[4]	Green told Officer Bonito that his son, Kenneth Green ("Kenneth") was the dog's owner.  Kenneth had brought the dog to Green's home several weeks prior and asked Green to temporarily keep the dog at his house, while Kenneth moved residences.  Green permitted him to leave the dog, but told Kenneth that he was responsible for taking care of it.  Green tried to feed the dog once, but the dog bit him.  Green had poor eyesight, but could see the dog at the back of the lot and was aware that it had wounds, believing them to have been caused by a raccoon attack.  Green explained to Officer Bonito that he did not have the financial resources to take the dog to a veterinarian, but that he had called his son multiple times and told him to come and get the dog and take care of it, but Kenneth had not done so.  Green telephoned Kenneth while Officer Bonito was at the residence, and Officer Bonito spoke to Kenneth.

[5]	Eventually, Officer Bonito loaded the dog onto a piece of plywood and, with Green's assistance, loaded the dog into his truck to transport it to ACC.  During this time, Kenneth arrived at the scene.  Officer Bonito conversed with Kenneth and issued citations to him for the lack of "care and treatment, . . . no rabies tags, no [] identification."[2]  *Tr.* at 30.

---

[2] Although Officer Bonito's testimony indicates that he cited Kenneth, Green's brief indicates that "citations were issued to both [Green] and his son." *Appellant's Br.* at 3.

[6] The dog was transported to ACC and, after being assessed, was euthanized. Thereafter, an ACC veterinarian examined the dog and determined that it was in a severe state of malnutrition, had muscle wasting and visible vertebrae, ribs and hips. It had overgrown nails and fleas crawling on fur. The wounds were open, and one was so deep that the bone was visible. The veterinarian indicated that sepsis was likely. She also testified that the wounds were not consistent with an animal attack. An ACC supervisor referred the matter for criminal prosecution.

[7] The State charged Green with Class A misdemeanor cruelty to an animal. It alleged that, on or about February 12, 2013 to March 12, 2013, Green recklessly, knowingly, or intentionally abandoned or neglected the brown dog by failing to provide adequate food and/or failing to seek veterinary care for an injury or illness that seriously endangered the life or health of the dog that was in Green's custody. *Appellant's App.* at 5.

[8] At the bench trial, the State called as witnesses: (1) Officer Bonito; (2) ACC veterinarian Natalie Mickelson ("Mickelson"); and (3) an ACC field supervisor, and Green later testified in his own case-in-chief. During Officer Bonito's testimony, he described his initial meeting with Green:

> Q: And, did you come into contact with anyone when you came to that property?
>
> A: I did. When I arrived, I came into contact with Mr. Patrick Green, uh, who was residing at the residence and I identified myself as an Officer with the City of Indianapolis, Animal Care and Control.
>
> . . . .

> Q: Upon coming into contact with Patrick Green, what did you do?
>
> A: I advised Mr. Green of uh, why I was there on his property. Uh, Mr. Green was very friendly, very cooperative and uh, I advised him that I needed to go and look at the dogs that were at the residence.
>
> Q: Did he permit you to do so?
>
> A: He did.
>
> Q: And, did you have occasion to observe the dogs?

*Tr.* at 8-9. At this point, Green's counsel objected and made a motion to suppress the evidence obtained by Officer Bonito, namely the brown pit bull, arguing that Green's consent to enter the premises and see the dogs was not voluntary. The State responded that Officer Bonito had no arrest powers and, at that point, was not conducting a criminal investigation; rather, he was acting upon a tip regarding the welfare of an animal. The State also asserted that Indianapolis city ordinances permitted Officer Bonito to check on the animal. After receiving argument, the trial court denied Green's motion, finding that the circumstances did not constitute a search. *Id.* at 14-16 ("I have not heard evidence that a search has been conducted.")

[9] Following the presentation of evidence, the trial court found Green guilty, and sentenced him to 180 days, of which 178 days were suspended and he received credit time for the remaining two days. The trial court imposed 178 days of non-reporting probation, as well as fines and costs to be paid during that probationary period. Green now appeals.

# Discussion and Decision

## I. Admission of Evidence

[10] Green asserts that the trial court erred when it admitted evidence obtained by Officer Bonito "after illegally entering [Green's] home." *Appellant's Br*. at 1. Admission of evidence is within the sound discretion of the trial court. *Davis v. State*, 907 N.E.2d 1043, 1048 (Ind. Ct. App. 2009). We will only reverse a decision of the trial court to admit evidence if there is an abuse of such discretion. *Id.* An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

[11] Green challenges the legality of the entry into his home by Officer Bonito. Green acknowledges that a warrantless search based on lawful consent is consistent with both the Indiana and Federal Constitutions, citing *Campos v. State*, 885 N.E.2d 590 (Ind. 2008), but argues that his consent to enter and search for the dogs was not voluntary. *Appellant's Br*. at 6. Assuming without deciding (1) that Officer Bonito's activities at Green's home constituted a "search" and (2) that the constitutional protections applicable to searches apply to a search conducted only by an ACC officer, as opposed to one executed with the assistance of a police officer, we address the merits of Green's claim that his consent to the search was not voluntary.

[12] Voluntariness is a question of fact determined from the totality of circumstances.[3] *Garcia-Torres v. State*, 949 N.E.2d 1229, 1237 (Ind. 2011). Under both the Fourth Amendment and the Indiana Constitution, the State carries the burden of proving that the consent was voluntarily given, and not the result of duress or coercion, express or implied. *Campos*, 885 N.E.2d at 600. Green argues that his consent was involuntary and invalid because it was the result of coercion. Specifically, he asserts that he was the victim of implied police coercion, based on the following statement by Officer Bonito: "I advised him that I needed to go and look at the dogs that were at the residence." *Tr.* at 8-9. The crux of Green's argument is that, because Officer Bonito said that he "needed" to see the dogs, he thereby implied that refusing to consent was not an option, making it the product of coercion. *Appellant's Br.* at 7.

[13] Here, Officer Bonito testified at trial that he was dispatched to the home to check on the welfare of one or more dogs. Upon arriving, Officer Bonito encountered Green and explained his reason for coming to Green's home. Green was friendly and cooperative, and he escorted Officer Bonito to the backyard to view the dogs. Green explained that the brown pit bull belonged to

---

[3] The "totality of the circumstances" from which the voluntariness of a defendant's consent is to be determined includes, but is not limited to, the following considerations: (1) whether the defendant was advised of his Miranda rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search. *Navarro v. State*, 855 N.E.2d 671, 675 (Ind. Ct. App. 2006)

his son, who, with Green's permission, had left the dog at Green's residence several weeks prior. Green told Officer Bonito that he tried to feed the dog, but that it bit him, and he was afraid of it. Green was aware that the dog was injured and indicated that he believed the leg wounds may have been the result of a raccoon attack. Green knew the dog needed medical attention, and he kept calling his son to come and take care of it, but he did not do so. Green eventually helped Officer Bonito load the dog into the ACC truck.

[14] We are not persuaded that Officer Bonito's singular statement that he "needed" to check on the dogs converted the situation into a coercive environment. Rather, Officer Bonito, an ACC officer, was simply providing Green with the reason for his visit, namely to check on the welfare of one or more dogs at the home. Thus, there was no deception on the part of Officer Bonito. There were not multiple police officers or police vehicles at the scene. The situation was not threatening or confrontational. Green was not under arrest or entitled to *Miranda* rights at the time of consent. Although there was no evidence presented that Green was informed of his right not to consent, this court has declined to adopt a bright-line rule requiring a defendant be informed of his right to refuse consent in order to find a consent is voluntary. *Navarro v. State*, 855 N.E.2d 671, 679 (Ind. Ct. App. 2006). Looking at the totality of the

circumstances, Green has not established the existence of any coercive activity, and we hold that Green's consent was freely and voluntarily given.[4]

## II. Sufficiency of the Evidence

[15] Green claims that the State failed to present sufficient evidence to convict him of animal cruelty. The deferential standard of review for sufficiency claims is well settled. This court will neither reweigh the evidence nor assess the credibility of witnesses. *Tooley v. State*, 911 N.E.2d 721, 724 (Ind. Ct. App. 2009), *trans. denied*; *Elisea v. State*, 777 N.E.2d 46, 48 (Ind. Ct. App. 2002). Rather, we will consider only the evidence and reasonable inferences most favorable to the trial court's ruling. *Elisea*, 777 N.E.2d at 48. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Tooley*, 911 N.E.2d at 724-25. Thus, if there is sufficient evidence of probative value to support the conclusion of the trier of

---

[4] Even if Green's consent was deemed involuntary, it is possible that a warrantless search might have been proper. Our Supreme Court has specifically recognized, "[T]here is no legitimate privacy interest in the appearance of a dog that has been tied up outside in an area readily observable by the public." *Trimble v. State*, 842 N.E.2d 798, 803 (Ind. 2006), *adhered to on reh'g*, 848 N.E.2d 278 (Ind. 2006). Where a police officer has received a timely tip concerning a possibly dangerous situation, the general privacy interest is diminished, and in some cases, information available to an officer may be sufficient to trigger an investigation from public space, which may justify further action, including entry into a yard. 842 N.E.2d at 804. "Once in the yard, the object of his search – an ambulatory animal in open space – is fair game; particularly when there are immediate health concerns regarding the dog." *Id.*; *see also Davis v. State*, 907 N.E.2d 1043, 1048 (Ind. Ct. App. 2009) (exigent circumstances permitted police officer to search curtilage in absence of search warrant). Because the record before us does not indicate whether the brown pit bull and its enclosure could be seen by the public, and because we find Green's consent was voluntarily given, we make no finding regarding whether a warrantless search would have been permissible in this case.

fact, then the verdict will not be disturbed. *Trimble v. State*, 848 N.E.2d 278, 279 (Ind. 2006).

[16] Indiana Code section 35-46-3-7(a) provides that a person who has a vertebrate animal in his or her custody and who recklessly, knowingly, or intentionally abandons or neglects the animal, commits cruelty to an animal, a Class A misdemeanor. In claiming that the evidence was insufficient, Green initially asserts that there was a "lack of evidence that [he] had custody of his son's dog." *Appellant's Br*. at 4. He directs us to Merriam-Webster Dictionary's definition of custody: "immediate charge and control exercised by a person or an authority; the act of protecting or taking care of something." *Id*. at 8. Green argues that because he had no control over the dog and was unable to take care of it, he therefore did not have custody of it. We reject Green's claim in this regard. We understand that Green did not own the dog; however, he agreed to allow Kenneth to leave the dog at his home for some temporary period of time while Kenneth moved residences. That is, the dog was not left at his home without his knowledge or consent. Furthermore, the dog started residing at Green's home at least several weeks prior to Officer Bonito's visit. That Green expressly instructed his son to feed and care for the dog does not obviate the fact that the dog was at Green's home, in his yard, and that, while it was there, Green was responsible for its welfare. We find that, based on the facts and circumstances before us, Green had custody of the brown pit bull.

[17] Green also claims that the evidence was insufficient because "the record is completely devoid of any facts that [Green] acted recklessly." *Appellant's Br*. at

7. A person engages in conduct "recklessly" if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct. Ind. Code § 35-41-2-2(c). The record before us reveals that Green did not want the dog or intend to keep or take care of it, but he nevertheless gave his son permission to leave it at his home. When Officer Bonito found the dog, it was severely emaciated. Mickelson testified that, on a "body conditions scale," from one to nine, the dog's score was a one, meaning it had no muscle fat and its entire skeleton was visible. *Tr.* at 40. The dog's carpal bones, similar to the human wrist, were dislocated or fractured on both front legs. It also had open, oozing wounds on both front legs. Mickelson testified that the severity of those wounds indicated that the injury had occurred anywhere between ten days to five weeks prior. She also stated that the injuries were not consistent with an animal attack. The front joints were very swollen, indicating sepsis, a bacterial infection. The dog was not able to walk. It was lying in its own feces and urine. Green had issues with his vision, and he did not approach the dog to inspect its injuries, but the evidence presented established that Green was aware that the dog was suffering with serious wounds and needed medical care. Green testified that he could not afford veterinary care, but he made multiple calls to his son, Kenneth, over the prior several weeks, asking Kenneth to get

the dog and take it for veterinary care, but Kenneth did not do so.[5] Green tried to feed the dog once, but the dog bit him, so Green did not attempt to feed it anymore. Green testified that the other gray pit bull, in healthy condition, belonged to his girlfriend, who resided with Green at the residence. There was no evidence that she also fed the brown dog. Based on the brown dog's severely emaciated condition, it is reasonable to infer that no one was feeding it.

[18] After the close of evidence, the trial court shared that it was "sympathetic" to Green for having been "placed in this position[.]" *Tr*. at 80. However, as the trial court reminded Green, he accepted physical custody of the dog, albeit as a favor to his son, and in so doing, Green accepted certain reasonable duties. The trial court observed that Green, in spite of his own physical ailments, understood that the dog needed medical attention. The trial court explained that the law does not allow a person, who has the physical care and custody of an animal, to neglect the animal, but avoid liability, "by . . . picking up the phone and calling the owner and saying your dog is dying in my backyard." *Id*. at 79-80. The trial court determined that Green recklessly disregarded the signs and symptoms of the dog's condition and failed to ensure that it received proper care, and it found Green guilty of committing animal cruelty. We find that the State presented sufficient evidence of probative value to support that determination. *See Trimble*, 848 N.E.2d at 279 (where dog was malnourished,

---

[5] At trial, an ACC supervisor testified to the various free or low-cost veterinary services available to the public. Green testified that he did not know about those available services, but if he had known, he would have contacted ACC.

injured, and frostbitten, evidence was sufficient to establish that defendant abandoned or neglected dog left in his care).

[19] Affirmed.[6]

Friedlander, J. and Crone, J., concur.

---

[6] We note that, at the sentencing hearing, the trial court inquired and the State confirmed that Green's son, Kenneth, was "subsequently charged," although with what offense(s) is not specified in the record before us. *Tr.* at 83.